IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAMELA M. BOBBITT,

                       Plaintiff,                                  No. 03:13-cv-01320-HZ

     v.

CAROLYN W. COLVIN, Acting                       OPINION & ORDER
Commissioner of Social Security,

                   Defendant.

Merrill Schneider
SCHNEIDER KERR & GIBNEY LAW OFFICES
P.O. Box 14490
Portland, Oregon 97293

       Attorney for Plaintiff

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Ronald K. Silver
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Jordan D. Goddard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Pamela Bobbitt brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits (DIB).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  I affirm the Commissioner's decision in part, reverse it in part, and remand

for additional proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB on December 22, 2009, alleging an onset date of September 28,

2008.  Tr. 16, 145-46.  Her application was denied initially and on reconsideration.  Tr. 95-99,

102-04.

     On February 22, 2012, Plaintiff appeared, with counsel, for a hearing before an

Administrative Law Judge (ALJ).  Tr. 34-65.  On March 2, 2012, the ALJ found Plaintiff not

disabled.  Tr. 13-33.  The Appeals Council denied review.  Tr. 1-6.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on Stevens Johnson disorder, diastolic heart failure,

bipolar disorder, arthritis, sleep apnea, diabetes, diverticulitis, gall bladder problems, edema, and

"other issues." Tr. 164.  At the time of the hearing, she was forty-five years old.  Tr. 38.  She is a

high school graduate with at least some college and has past relevant work experience as a sales

representative, dispatcher, teacher's aide, and a cook/server.  Tr. 27, 38, 60-61.  Because the parties are familiar with the medical and other evidence of record, I refer to any additional relevant facts necessary to my decision in the discussion section below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed

disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through her date of last insured.  Tr. 18.  Next, at steps two and three, the ALJ determined that Plaintiff has severe impairments of obesity, edema of the legs, bipolar disorder, and substance abuse, but that the impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 18-20.

At step four, the ALJ concluded that Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she is limited to lifting and carrying 10 pounds frequently and occasionally, standing and walking for 2 hours in an 8-hour workday, and sitting for 6 hours in an 8-hour workday.  Tr. 20.  She can occasionally climb and can occasionally perform all other postural activities.  <u>Id.</u>  She can have no exposure to heights or hazards.  <u>Id.</u>  She is limited to simple, routine tasks, and can have only occasional in-person public contact.  <u>Id.</u>  With this RFC, the ALJ determined that Plaintiff is unable to perform

any of her past relevant work.  Tr. 27.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as surveillance system monitor and addresser.  Tr. 28.  Thus, the ALJ determined that Plaintiff is not disabled.  Id.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff contends that the ALJ made the following errors:  (1) failed to find her diastolic heart failure a severe impairment at step two; (2) improperly rejected the opinion of her treating mental health nurse practitioner; and (3) failed to include a work-related limitation in the RFC.  I address the arguments in turn.

/ / /

5 - OPINION & ORDER

I.  Step Two Determination

At step two of the sequential analysis, the ALJ considers the severity of the claimant's impairment(s).  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  "Basic work activities" are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, and lifting.  20 C.F.R. § 404.1521(b).  In Social Security Ruling (SSR) 85-28 (available at 1985 WL 56856, at *3), the Commissioner has explained that "an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities"; see also SSR 96-3p (available at 1996 WL 374181, at *1) ("an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.").

The Ninth Circuit has explained that the step two severity determination is expressed "in terms of what is 'not severe.'"  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  The ALJ is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity.  Id.  Importantly, as the Ninth Circuit noted, "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  Id. (citing Yuckert, 482 U.S. at 153-54).

"[T]he severity regulation is to do no more than allow the [Social Security Administration] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working."  SSR 85-28 (available at 1985 WL 56856, at *2) (internal quotation marks omitted).  Therefore, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is

6 - OPINION & ORDER

'clearly established by medical evidence.'" <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005) (quoting SSR 85-28). The court's task in reviewing a denial of benefits at step two is to "determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." <u>Id.</u>

The ALJ noted that Plaintiff was hospitalized with chest pain in November 2009. Tr. 18 (citing Tr. 430). She was discharged a couple of days later with a primary diagnosis of congestive heart failure, diastolic. <u>Id.</u> (citing <u>Id.</u>). Testing while she was in the hospital showed moderate concentric left ventricular hypertrophy with a normal left ventricular size and normal systolic function. <u>Id.</u> (citing <u>Id.</u>). There was no evidence of myocardial ischemia. <u>Id.</u> (citing Tr. 441).

A January 18, 2010 echocardiogram revealed concentric left ventricular hypertrophy with normal to hyperdynamic left ventricular systolic function, and no significant valvular abnormalities. <u>Id.</u> (citing Tr. 329). The ALJ noted that several months later, on November 3, 2010, a chest x-ray showed cardiomegaly with no significant congestive heart failure. <u>Id.</u> (citing Tr. 627). On November 8, 2010, her diastolic congestive heart failure was noted to be stable. <u>Id.</u> (citing Tr. 467).

The ALJ did not further discuss Plaintiff's heart condition in connection with this step two analysis other than to note that it causes only transient and mild symptoms and limitations which are well controlled with treatment. <u>Id.</u> Thus, it did not constitute a severe impairment. <u>Id.</u>

Plaintiff argues that contrary to the ALJ's conclusion that Plaintiff's diastolic congestive heart failure was stable in November 2010, evidence after that date shows that she continued to

7 - OPINION & ORDER

experience exacerbations of symptoms and that the condition required frequent hospitalizations. Plaintiff notes that in February 2011, a myocardial perfusion imaging test done in response to Plaintiff's complaints of shortness of breath and chest pain was "mild to moderately abnormal" with a small area of "moderate intensity reversible defect involving the lateral wall." Tr. 836-37. The left ventricular cavity size was mildly enlarged. Tr. 837. Her "ejection fraction," however, was "at the low end of the normal range." Id.[1] A few weeks later, chest x-rays showed that Plaintiff's heart continued to be "generous" in size. Tr. 838.

In July 2011, an echocardiogram showed normal functioning with only mild enlargement of the heart. Tr. 844-46. Her left ventricular function was found to be normal. Tr. 845. One month later, on August 11, 2011, Plaintiff had another chest x-ray which was unremarkable except for an above average but stable silhouette size. Tr. 846.

On August 25, 2011, Plaintiff went to the emergency room because she felt "weird." Tr. 673. She was vague about her symptoms. Id. She had been to the beach and had increased leg edema. Tr. 674. Emergency department physician Dr. Wendy Meyers, M.D. noted that a chest x-ray showed no change from the previous one performed and that there was no congestive heart failure. Tr. 680. On physical examination, Plaintiff was slightly short of breath but was speaking in full sentences. Tr. 683. Plaintiff's effort was normal and her breath sounded normal. Id. She exhibited some edema, rated as 1+ to her knees bilaterally. Id. Dr. Meyers noted that Plaintiff's heart disease was stable, she had only mild tachycardia, and no acute intervention was required. Tr. 684. The presence of edema was noted, but it was indicated to be "not marked," with a dry

---

[1] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts." www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-20058286.

mouth, clear lungs, and "no e/o CHF or volume overload." Id. Dr. Meyers also noted that Plaintiff's drug screen, performed during the emergency room visit, was positive for amphetamines. Tr. 680. Plaintiff was admitted to the hospital.

Plaintiff remained in the hospital for a couple of days. Tr. 673 (showing discharge on August 28, 2011). The hospitalist who attended to her during her stay noted that her diastolic congestive heart failure appeared "euvolemic"[2] at this time. Tr. 663. Her weight was near baseline. Id.

Plaintiff notes that some of the records from the August 25-28, 2011 hospitalization refer to a prior hospitalization just a couple of weeks earlier, for congestive heart failure and abdomen wall cellulitis. See Tr. 685 (Dr. Meyers's emergency room chart note stating that Plaintiff "was recently hospitalized for congestive heart failure and abdomen wall cellulitis" and that she was "discharged on 8-11-11"); see also Tr. 683 (emergency room note remarking that Plaintiff had a recent hospital admission for abdominal cellulitis), Tr. 660 (hospital social worker referred to two prior hospitalizations in the last two months). Based on this evidence, Plaintiff argues that her heart symptoms were not resolved within twelve months as the ALJ suggested and her repeated hospitalizations would naturally have a "more than minimal effect" on her ability to work and thus, should be considered "severe" at step two.

But, as Defendant notes, the comments in the records of Plaintiff's August 25-28, 2011 hospitalization regarding a prior hospitalization in August and two prior hospitalizations in the last two months are based on Plaintiff's self-report and are not corroborated by her records. The

---

[2] Euvolemic means having "appropriate hydration (neither excessively hydrated nor dehydrated)." Taber's Cyclopedic Medical Dictionary 817 (21st ed. 2009).

9 - OPINION & ORDER

August 11, 2011 record is only of the chest x-ray, not of a hospitalization.  There is no evidence in the record that Plaintiff had been previously hospitalized in August 2011 or had been hospitalized two previous times in the prior two months.  Additionally, Dr. Meyers concluded that Plaintiff did not appear to be in congestive heart failure at the time.  Tr. 680.  She also remarked that the use of methamphetamines was not good for anyone but especially not for someone suffering from bipolar disorder taking four psychiatric medications.  Id.

Given the lack of evidence in the record to support Plaintiff's contention that she has frequent hospitalizations related to her congestive heart failure, Plaintiff fails to establish that the ALJ erred by concluding that as of November 2010, her heart condition was stable and was not a severe impairment at step two.

Moreover, even if the ALJ did err, the error was harmless.  Where the ALJ fails to list a medically determinable impairment at step two, but nonetheless considers the limitations posed by the impairment in the RFC, any error at step two is harmless.  E.g., Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence of limitations posed by claimant's bursitis at step four of the disability analysis, any error in failing to consider bursitis "severe" at step two was harmless).

At the hearing, Plaintiff testified that her congestive heart failure caused swelling in her legs making it hard for her to walk and breathe.  Tr. 44.  She requires elevating her legs.  Id.  The ALJ, however, found the swelling in her legs to be a severe impairment and limited her to sedentary work.  Tr. 20.  Given that the ALJ took the limitations caused by her congestive heart failure into account in formulating the RFC, any step two error was harmless.

/ / /

10 - OPINION & ORDER

II.  Treating Mental Health Nurse Practitioner

Psychiatric Mental Health Nurse Practitioner Carolyn Morris was Plaintiff's "psychiatric prescriber" beginning in July 2010.  Tr. 909.  Over the course of approximately eighteen months, NP Morris had approximately forty contacts with Plaintiff, averaging about two times per month. Id.  In February 2012, NP Morris completed a questionnaire sent to her by Plaintiff's counsel which included a mental residual functional capacity assessment.  Tr. 909-12.  NP Morris noted that Plaintiff's current diagnoses were bipolar disorder and post-traumatic stress disorder PTSD) for which Plaintiff received medication and psychotherapy.  Tr. 909.  She described Plaintiff's symptoms as including extreme mood swings, panic attacks, and transient paranoia.  Tr. 910. She assessed Plaintiff extremely impaired in concentration, persistence, or pace.  Tr. 910.  She also found her social functioning and her activities of daily living to be extremely impaired.  Tr. 911.  In terms of the actual workplace and her ability to sustain activities over an eight-hour day, NP Morris opined that Plaintiff would be markedly limited in several abilities, including her ability to maintain attention and concentration, perform activities within a regular schedule and maintain regular attendance, complete a normal workday without interruption from psychologically based symptoms, accept instructions and respond appropriately to supervisors, and respond appropriately to changes in the work setting.  Tr. 911.  NP Morris also stated that Plaintiff would miss more than two days of work per month because of her impairments, symptoms, and medication side effects.  Tr. 912.

The ALJ noted NP Morris's treatment of Plaintiff.  Tr. 23, 24, 26.  He described NP Morris's February 21, 2012 assessment.  Tr. 26.  He gave NP Morris's opinion little weight because her limitations were based on Plaintiff's subjective complaints which the ALJ found to

be unworthy of belief, and further, because they were not supported by medical evidence of record.  Id.

Plaintiff argues that the ALJ erred in rejecting NP Morris's February 21, 2012 limitations and her opinion should have been given more weight based on the factors in 20 C.F.R. § 404.1527 and Social Security Ruling (SSR) 06-3p.  I disagree.

Under regulations governing the weight to be accorded to medical opinions, "acceptable medical sources" include licensed physicians and licensed psychologists, but not nurse practitioners.  20 C.F.R. § 404.1513(a), (d)(1).  Nurse practitioners are deemed to be "other sources."  Id.  Under Ninth Circuit law, evidence from "other sources" is considered  under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (because physician's assistant was not an acceptable medical source, ALJ could discount physician's assistant's opinion for germane reasons); Dale v. Colvin, No. 03:13-cv-01187-HZ, 2014 WL 1917980, at *7 (D. Or. May 13, 2014) (because nurse practitioner was an "other source," ALJ could reject opinion for germane reasons).

In Social Security Ruling (SSR) 06-03p, available at 2006 WL 2329939, the Social Security Administration (SSA) recognized that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.

Id. at *3.  The SSA recognized that "[o]pinions from these medical sources, who are not

technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id.

Medical sources who are not "acceptable medical sources" may not establish the existence of a medically determinable impairment, but, "information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. at *2. Factors for consideration of such other medical source opinions include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. Id. at *4-5.

The law allows the opinion of an acceptable medical source to be rejected if that medical source relies primarily on a claimant's self-report and the claimant has been found to be less than credible. E.g., Turner v. Comm'r, 613 F.3d 1217, 1223 (9th Cir. 2010); Bray v. Comm'r, 554 F.3d 1219, 1228 (9th Cir. 2009). Given that the standard for rejecting those opinions is higher than the standard for rejecting lay witness or "other" medical source opinions, the law is the same: rejecting an opinion of an "other" medical source because the opinion is primarily based on the self-report of a claimant found not credible is a "germane" reason in support of that rejection.

The ALJ in this case found Plaintiff not credible. Tr. 25-26 (explaining that Plaintiff's

repeated denials of drug use despite positive drug screens, observations of medical staff regarding her ability to ambulate, and her testimony about her education, combined to "render anything the claimant has said not worthy of belief"; noting that she had "no credibility whatsoever" and had lied to medical staff, to Social Security representatives, and to the ALJ while under oath).  Plaintiff does not challenge the ALJ's credibility determination.

NP Morris did have a fairly lengthy relationship with Plaintiff.  Tr. 909 (had seen her in the psychiatric department since March 2005 and had been her "prescribing practitioner" from July 2010 to January 2012).  She is a specialist in mental health issues.  But, the SSA still recognizes her as only an "other" medical source whose opinion may be rejected for germane reasons.  The ALJ gave a germane reason and Plaintiff does not dispute the adverse credibility determination upon which the ALJ's reason is based.  The ALJ did not err.

III.  Adequacy of the RFC

State agency medical consultants Dr. Joshua Boyd, Psy. D., and Dr. Bill Hennings, Ph.D. opined that Plaintiff's PTSD symptoms would limit her to "short and simple instructions of 1-2 steps."  Tr. 73, 87.  In reviewing the record, the ALJ gave "some weight" to Dr. Boyd's opinion, stating that it was "supported by the medical evidence of record." Tr. 27.[3]  Based on his acceptance of Dr. Boyd's opinion, the ALJ limited Plaintiff to the performance of "simple, routine tasks[.]" Tr. 20, 27.

Plaintiff argues that the ALJ erred because the limitation given by the ALJ does not properly capture the limitation given by Dr. Boyd.  Plaintiff further argues that the error is not

_____

[3]  The ALJ did not separately address Dr. Hennings's opinion, but it was identical to Dr. Boyd's opinion, even repeating the error of using a male pronoun when referring to Plaintiff.

harmless because the limitation given by Dr. Boyd is inconsistent with the required reasoning levels prescribed in the Dictionary of Occupational Titles (DOT) for the jobs that the ALJ found that Plaintiff could perform.  I agree with Plaintiff.

The DOT is a Department of Labor publication that identifies duties for jobs and the abilities necessary to perform those jobs.  See DOT (4th ed. 1991), available at http://www.oalj.dol.gov/libdot.htm.  Each job description in the DOT includes a "definitional trailer" which uses a numerical system to identify the abilities a person needs in order to perform the given job.  For example, the surveillance system monitor job identified by the vocational expert (VE) in this case is DOT # 379.367-010, and the description for that job can be found at 1991 WL 673244.  The definitional trailer for each job includes a specific "reasoning development level" which uses a one through six scoring system to identify how much reasoning ability is required for the particular job.  See, e.g., 1991 WL 673244 (showing surveillance system monitor job requiring a Level Three Reasoning); 1991 WL 671797 (showing job description for addresser job, DOT #209.587-020, with Level Two Reasoning).

The components of the definitional trailer are explained in Appendix C to the DOT, available at 1991 WL 688702.  The reasoning levels are under the section for "General Educational Development" (GED).  The GED Scale is composed of three sections: reasoning, math, and language development.  Level Two Reasoning is defined as having the reasoning ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations."  1991 WL 688702.  Level Three Reasoning is defined as "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic

form.  Deal with problems involving several concrete variables in or from standardized situations."  Id.  In contrast, Level One Reasoning is defined as having the reasoning ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  Id.

Plaintiff argues that jobs requiring Level Two Reasoning and above are inconsistent with Dr. Boyd's limitation that she has the ability to carry out only simple one- or two-step tasks, a limitation directly correlative to Level One Reasoning.  Defendant contends that the ALJ's restriction to "simple" jobs is consistent with the limitation expressed by Dr. Boyd and that in any event, any error is harmless.

In a 2013 decision, I concluded that an RFC limiting the plaintiff to "simple, routine tasks and instructions," was not inconsistent with Level Two Reasoning.  Patton v. Astrue, No. 06:11-cv-06423-ST, 2013 WL 705909, at *1 (D. Or. Feb. 25, 2013).  In a subsequent decision, I noted that several other decisions had reached the same conclusion as I had in Patton.  Chase v. Colvin, No 06:12-cv-01857-HZ, 2013 WL 5567082, at *3 (D. Or. Oct. 9, 2013).  In Chase, however, I noted the distinction between a limitation to "simple" and "routine" tasks on the one hand and the limitation to jobs with one- and two-step instructions on the other hand.  Id. at *4.  I noted that in a 2011 case, Judge Mosman found that a specific limitation to "simple one to two step commands" was distinct from the more general limitation to "simple" and "routine" tasks.  Id. (citing Whitlock v. Astrue, No. 03:10-cv-00357-AC, 2011 WL 3793347, at *5 (D. Or. Aug. 24, 2011)).

In a very recent decision, Judge Simon also noted that a limitation to "1-2 step

16 - OPINION & ORDER

instructions" is "distinct from the more general limitation to 'simple,' 'routine,' or 'repetitive' tasks." Trujillo v. Colvin, No. 03:13-cv-0620-SI, 2014 WL 2213218, at * (D. Or. May 27, 2014). As he noted, the "weight of authority . . .finds that the addition of the specific wording relating to 'one- or two-step instructions' is more restrictive" than the phrasing of the more general "simple" and "routine" limitation.  Id.

While these observations and conclusions have come in the context of determining whether an ALJ's limitation to one- or two-step instructions is consistent with the required reasoning for Level Two Reasoning occupations, they are instructive nonetheless in rebutting Defendant's argument that the ALJ's restriction to "simple" tasks correlates to Dr. Boyd's restriction to one- to two-step tasks.  For the reasons Judge Mosman, Judge Simon, and I have already articulated, I reject Defendant's argument.  The ALJ erred by not expressly including Dr. Boyd's limitation in the RFC.

Furthermore, I agree with Plaintiff that the error is not harmless.  As the previously-cited cases indicate, a restriction to jobs with one- or two-step tasks or instructions is not consistent with Level Two Reasoning.  E.g., Chase, 2013 WL 5567082, at *5 (noting that the correlation between a one- or two-step instruction restriction and the requirements of Level One Reasoning "could not be more exact"); Whitlock, 2011 WL 3793347, at *5 (restriction to "one to two step commands" "is a nearly verbatim recital of the DOT definition of reasoning level one").[4]  Thus,

---

[4] Defendant's reliance on the unpublished 2012 Ninth Circuit case Bordbar v. Astrue, 475 F. App'x 214 (9th Cir. July 30, 2012) is unavailing.  Contrary to Defendant's representation that the court found no conflict between a limitation to "one to two step simple instructions kind of jobs" and jobs with Level Two Reasoning, the court declined to resolve that issue.  Id. at 215. Instead the court found that even if there was error, it was harmless because the record, including opinions by the state agency medical consultant and the consulative examiner, established that the plaintiff could in fact perform detailed instructions.  Here, the state agency medical consultant

the jobs identified by VE in this case, which carry a Level Two Reasoning and a Level Three

Reasoning, are inconsistent with the limitation given by Dr. Boyd.  Had the ALJ properly

included Dr. Boyd's limitation, and had the VE still identified the surveillance system monitor

and addresser as jobs the Plaintiff could perform, there would be a conflict between the

representative occupations and Plaintiff's limitations.  Thus, the error is not excused as harmless.

Finally, for the reasons set forth in <u>Chase</u>, 2013 WL 5567082, at *4-5, I reject

Defendant's argument that the reasoning levels do not reflect the actual abilities to perform a job

and are not intended as a job description or requirement.

CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings,

limited to revising the RFC to include Dr. Boyd's limitation to "short and simple instructions of

1-2 steps" and obtaining updated VE testimony at steps four and five.

IT IS SO ORDERED.

Dated this _____ day of ___July_____, 2014

_____

Marco A. Hernandez
United States District Judge

---

provided the more restrictive limitation which the ALJ failed to include in the RFC and thus, the
record does not provide support for a conclusion that any conflict is harmless.

18 - OPINION & ORDER